## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

DARLENE STINGER,
SHARON BUSH and
TIA NEWTON,

     Plaintiffs,

     v.

FORT LINCOLN CEMETERY, LLC and
SERVICE CORPORATION
INTERNATIONAL,

     Defendants.

Civil Action No. TDC-20-1052

## MEMORANDUM OPINION

Plaintiffs Darlene Stinger, Sharon Bush, and Tia Newton have filed a civil action against Fort Lincoln Cemetery, LLC ("Fort Lincoln") and Service Corporation International ("SCI"), in which they allege violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219 (2018). Pending before the Court is Defendants' Motion to Dismiss and to Strike Collective Action Allegations, ECF No. 22. For the reasons set forth below, the Motion will be GRANTED.

## BACKGROUND

SCI, a publicly traded company incorporated in and with its principal place of business in Texas, provides funeral, cremation, and cemetery services through its many subsidiaries. SCI is a holding company that has no employees. Fort Lincoln is a Maryland limited liability company that owns and operates a funeral home, crematory, and cemetery in Brentwood, Maryland. SCI wholly owns Stewart Enterprises, Inc., which wholly owns S.E. Mid-Atlantic, LLC, which in turn

wholly owns Fort Lincoln.  Fort Lincoln contracts with another SCI subsidiary, SCI Shared Resources, LLC ("SCI Shared Resources"), to provide payroll and other services.

Plaintiffs were employed by Fort Lincoln as "Counselors."  Compl. ¶¶ 15-17, ECF No. 1. Counselors' duties include selling a range of products, assisting with burials, and conducting administrative tasks at the office.  Counselors are paid according to a compensation system set forth in Fort Lincoln's "Family Services Sales Incentive Plan Document" ("the Sales Incentive Plan").  *Id.* ¶ 31.  As a part of that system, Counselors receive a commission on any contract negotiated by the Counselor if various conditions have been met, including that the contract was not canceled in its first year and was paid on time.  Until all conditions are met on a sales contract, Counselors are paid a portion of the commission as an "Unearned Advance," with the remainder of the commission allocated to a reserve account for the Counselor.  *Id.* ¶¶ 37-42.  However, if any of the required conditions on a contract are never met, the amount of the Unearned Advance on the contract is deducted from the Counselor's reserve account.  Under the compensation system, if a Counselor's "payable biweekly commission amount" does not add up to the legally required minimum wage for all hours worked during the relevant pay period, the Counselor is paid a "Minimum Wage Adjustment" sufficient for the Counselor to have received the minimum wage for that pay period.  *Id.* ¶ 45.  This amount, however, is deducted from the Counselor's total commissions for the relevant month.  The compensation system also provides a structure for paying overtime and requires that Counselors repay Fort Lincoln for any overpayments.

Between August 2015 and April 2019, Fort Lincoln required new employees to sign electronically an arbitration agreement, entitled the "Principles of Employment and Arbitration" ("PEAP").  Joint Record ("J.R.") 9, ECF No. 28-1.

2

In April 2019, Fort Lincoln adopted a new arbitration agreement, the Mutual Resolution Process Agreement ("MRPA") that had to be signed by all current and new employees. Section I.A of the MRPA identifies the "Entities and Persons Covered" by the agreement:

> "Company" means your employer, as shown on your paycheck or earnings statement. In the event you believe that another related entity may be responsible for any claims asserted under this Agreement, then the entities covered under this Agreement will also include Service Corporation International, all of its subsidiaries and affiliates and any successor entities (the "Entities"). It also includes all officers, directors, associates or agents of the Entities.

J.R. 26. Section I.B, in turn, establishes when the MRPA becomes effective:

> Associates, Entities and the Company (the "Parties") agree to the terms of this Program. The Associate indicates his or her agreement to this Program and its terms and conditions by beginning employment with the Company on the date of Associate's hire (the "Effective Date"). By submitting this Program to the Associate, the Company and the Entities agree to this Program and its terms and conditions.
>
> Many Associates are currently parties to an agreement entitled the Principles of Employment & Arbitration Procedures (the "PEAP"). The PEAP will continue to cover all disputes commenced before the Effective Date, unless the Parties agree to apply this Program.

*Id.*

The MRPA requires arbitration of claims brought against "individuals who are current or former directors, officers, employees, fiduciaries of the Company and/or the Entities, third parties who provide administrative services," and agents "who acted on the Company's/the Entities' behalf." J.R. 28. As for the types of disputes subject to arbitration, the MRPA applies to "present or future claims between an Associate, the Company and the Entities that arise out of or relate in any way to the Associate's employment application, employment and/or termination of employment," including claims relating to "employment terms and conditions" and "wages and compensation." *Id.* By its express terms, the MRPA applies to claims under the FLSA. J.R. 29. Under the MRPA, "the rules governing the arbitration will be the then-current Employment

3

Arbitration Rules and Procedures of JAMS," but "[t]he Parties agree that Rules 6(e) and 21 of the current Employment Arbitration Rules and Procedure do not apply to any arbitration under" the MRPA. J.R. 31.

Newton signed the PEAP when she was hired in August 2015, then signed the MRPA in May 2019. Bush signed the PEAP in February 2019 when she started working at Fort Lincoln, then signed the MRPA in May 2019. Stinger joined Fort Lincoln in June 2019 and signed the MRPA at that time.

In their Complaint, Plaintiffs allege that Defendants violated the FLSA by failing to pay them the minimum wage during certain work weeks. Plaintiffs also allege that Defendants violated the FLSA by failing to pay them for overtime hours at one and a half times their regular rate. Plaintiffs further allege that Defendants' compensation system violated the FLSA's requirement that wages be paid "free and clear" because the system sometimes required future repayment. Compl. ¶¶ 65-66. Plaintiffs assert an FLSA collective action on behalf of, and seek damages sustained by, themselves and similarly situated employees.

## DISCUSSION

In their Motion, Defendants seek three different results. First, Defendants seek dismissal of the present case and to compel arbitration pursuant to Federal Rule of Civil Procedure 12(b)(3) and the MRPA. Second, Defendants request that the Court strike Plaintiffs' collective action allegations as barred by the MRPA. Third, SCI seeks dismissal for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) on the grounds that it lacks the necessary minimum contacts with Maryland. Plaintiffs oppose the Motion. In support of their briefing, the parties have conducted jurisdictional discovery and provided a joint record that totals nearly 400 pages. The Court also conducted a hearing on the Motion on March 12, 2021.

Where jurisdiction is a threshold issue that must be resolved before considering the merits, the Court first addresses the claim that the Court lacks personal jurisdiction over SCI.

## I.     Personal Jurisdiction

Pursuant to Federal Rule of Civil Procedure 12(b)(2), SCI argues that because it is a Texas corporation that does not conduct business in Maryland and does not have sufficient minimum contacts with Maryland, the Court should dismiss the claims against it for lack of personal jurisdiction.

### A.     Legal Standard

Under Rule 12(b)(2), the plaintiff has the burden to establish personal jurisdiction. *See Mylan Labs. Inc. v. Akzo, N.V.*, 2 F.3d 56, 59-60 (4th Cir.1993). To carry that burden at the pleading stage, the plaintiff need only make a *prima facie* showing that the defendant is properly subject to this Court's jurisdiction. *Id.* at 60. In evaluating the plaintiff's showing, this Court must accept the plaintiff's allegations as true and must resolve any factual conflicts in the plaintiff's favor. *Id.* When personal jurisdiction "turns on disputed factual questions," "the court may resolve the challenge on the basis of a separate evidentiary hearing." *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989).

For a district court to assert personal jurisdiction over a nonresident defendant, the exercise of jurisdiction (1) "must be authorized under the state's long-arm statute"; and (2) "must comport with the due process requirements of the Fourteenth Amendment." *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). In this instance, the Court need not assess authorization under the Maryland long-arm statute because, as discussed below, it finds that an exercise of personal jurisdiction would not comport with due process requirements.

5

A court may exert personal jurisdiction over a nonresident defendant in keeping with due process if the defendant has "certain minimum contacts" with the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457 (1940)). Determining whether a defendant has such contacts is a fact-specific undertaking. *Kulko v. Superior Court of Cal.*, 436 U.S. 84, 92 (1978).

Courts distinguish between two types of personal jurisdiction: general and specific. A court has general personal jurisdiction over out-of-state defendants whose "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *BNSF Ry. Co. v. Tyrrell*, 137 S. Ct. 1549, 1558 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 137 (2014)). For a corporate defendant, general jurisdiction typically exists in the state in which it was incorporated or in which its principal place of business is located. *Id.* In an "exceptional case," a corporate defendant's operations in the forum state may be so "substantial" "as to render it" subject to general jurisdiction there. *Id.* (quoting *Daimler AG*, 571 U.S. at 139 n.19).

A court has specific personal jurisdiction when the defendant has "'purposefully established minimum contacts in the forum State' such 'that [it] should reasonably anticipate being haled into court there.'" *Perdue Foods LLC v. BRF S.A.*, 814 F.3d 185, 189 (4th Cir. 2016) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). In assessing whether specific jurisdiction exists, the court must consider "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Id.* (quoting *ALS Scan, Inc. v. Digital*

6

*Serv. Consultants, Inc.*, 293 F.3d 707, 712 (4th Cir.2002)). A plaintiff must prevail on each prong. *Id.*

## B.  Due Process

In arguing that this Court has personal jurisdiction over SCI, Plaintiffs allege that "SCI controls the operations of Fort Lincoln." Compl. ¶ 12. Plaintiffs primarily on rely on the following facts. First, SCI, through various other subsidiaries, owns both Fort Lincoln and SCI Shared Resources, the company which provides payroll services to Fort Lincoln. Second, certain of Plaintiffs' pay stubs include the SCI logo and were issued from an address in Houston, Texas, shared by SCI and SCI Shared Resources, and "SCI Shared Resources LLC, Agent for Fort Lincoln Cemetery" is listed as Plaintiffs' employer on their Internal Revenue Service Forms W-2 ("W-2s"). J.R. 341. Similarly, "SCI Shared Resources LLC" was referenced as the employer on Stinger's COBRA insurance documents. J.R. 343.

Third, Plaintiffs allege that SCI "set the compensation plan" and controlled "the pay practices" of Fort Lincoln, based on the fact that the Sales Incentive Plan is labeled as an SCI document, states that it is consistent with "SCI's philosophy," and defines the term "SCI" as used in the Sales Incentive Plan as "the affiliated entity of Service Corporation International that employs you." J.R. 336. Fourth, Plaintiffs allege that "SCI set the polices that controlled" how Fort Lincoln personnel work, based on the fact that their work is governed by "the Dignity Memorial Family Services Guidebook," and the Dignity Memorial trademark is registered to another SCI subsidiary, "SCI Management L.P.," and its general partner, "SCI Administrative Services, L.L.C." J.R. 394. The "Dignity Memorial Family Service Guidebook" states on its face that it is copyrighted by "SCI Funeral & Cemetery Purchasing Cooperative, Inc.," J.R. 222, which, as stated at the hearing by counsel for Defendants, is a predecessor name for SCI Shared Resources.

7

Fifth, the MRPA includes "Service Corporation International, all of its subsidiaries and affiliates and any successor entities" as parties bound by the MRPA. J.R. 26.

General jurisdiction does not exist because it is undisputed that SCI is a Texas corporation and maintains its principal place of business in Houston, Texas, and the handful of Maryland contacts alleged by Plaintiffs do not suggest that SCI's operations in Maryland are so significant as to present an "exceptional case." *BNSF Ry. Co.*, 137 S. Ct. at 1558. Plaintiffs do not argue otherwise.

As for specific jurisdiction, Plaintiffs have failed to identify sufficient contacts with Maryland that relate to their claims and establish purposeful availment by SCI. The fact that Fort Lincoln is a wholly owned subsidiary of SCI does not alone establish specific jurisdiction. *See Mylan Labs, Inc.*, 2 F.3d at 63. Although Plaintiffs highlight various ways in which subsidiaries of SCI or entities with "SCI" in their name, most notably SCI Shared Resources, are connected in some way to Fort Lincoln's business operations in Maryland, Plaintiffs have not established that SCI—the corporate entity actually named as a Defendant—has purposefully availed itself of Maryland through its own activities related to Plaintiffs' claims. While Plaintiffs allege that SCI directly imposes the Sales Incentive Plan on Fort Lincoln, the only direct evidence on this issue is the statements in the declaration by Janet Key, an SCI Shared Resources official, that SCI is a holding company with no employees, "does not manage the business activities" of Fort Lincoln, does not "hire, supervise or terminate" its employees, and does not pay their salaries. J.R. 2-3; *see Carefirst of Maryland, Inc.*, 334 F.3d at 403 (affirming the district court's finding that it lacked personal jurisdiction where the court relied on jurisdictional discovery, including affidavits). The Sales Incentive Plan itself, while containing references to "Service Corporation International," states that "SCI" merely "refers to the affiliated entity of Service Corporation International that

employs you" and thus does not establish that SCI actually manages Fort Lincoln's business activities or controls its pay structure. J.R. 336.

Though both SCI and SCI Shared Resources are referenced in the payroll records, consideration of those records leads to the conclusion that SCI Shared Resources, rather than SCI, had a role in Fort Lincoln's payroll activities, particularly where the W-2s list "SCI Shared Resources LLC," not SCI, as the employer. J.R. 341. Likewise, it is SCI Shared Resources, not SCI, whose predecessor company name is listed on the Dignity Memorial Family Services Guidebook. Where these alleged jurisdictional contacts are those of SCI's subsidiaries, Plaintiffs' attempt to impute them to SCI fails. In Maryland, the "agency" test is used to assess whether to pierce the corporate veil for the purposes of personal jurisdiction. *Mylan Labs, Inc.*, 2 F.3d at 61. Maryland's agency test allows a court to attribute the contacts of a subsidiary to an out-of-state parent corporation "only if the parent exerts considerable control over the activities of the subsidiary." *Id.* at 61. The most important factor in assessing control is "whether significant decisions of the subsidiary must be approved by the parent." *Id.* Other factors include: (1) whether the parent and subsidiary "maintain separate books and records, employ separate accounting procedures, and hold separate directors' meetings"; and (2) whether the subsidiary has "some independent reason for its existence, other than being under the complete domination and control of another legal entity simply for the purpose of doing its act and bidding." *Id.* (citations omitted).

Plaintiffs do not allege, and the facts do not establish, that Fort Lincoln must receive SCI's approval for significant decisions, that SCI maintains overlapping financial books, accounting procedures, or directors' meetings with Fort Lincoln, or that Fort Lincoln has no independent reason for existence. The same is true for SCI Shared Resources and the other identified subsidiaries. Accordingly, the contacts of SCI's subsidiaries, including SCI Shared Resources, are

not properly imputed to SCI for the purpose of assessing personal jurisdiction over SCI. *See Haley Paint Co. v. E.I. Dupont De Nemours and Co.*, 775 F. Supp. 2d 790, 793, 799-800 (D. Md. 2011) (declining to pierce the corporate veil and finding no personal jurisdiction where the subsidiary with Maryland contacts had a separate corporate entity, maintained its own corporate records, bank accounts, payroll and assets, and controlled its own day-to-day operations, and where plaintiffs' evidence of control by the parent company consisted of "corporate newsletters and investor communications" that were "corporate puffery regarding" the synergies between the parent and subsidiary); *Newman v. Motorola, Inc.*, 125 F. Supp. 2d 717, 723 (D. Md. 2000) (declining to pierce the corporate veil and finding no personal jurisdiction over a parent company where the subsidiary was a separate corporate entity, maintained "its own financial records," had a "separate purpose," and was not alleged to be "a sham corporation," even though the subsidiary's SEC filings stated that the parent would "control [its] management and affairs").

Alternatively, Plaintiffs argue that SCI should be subject to personal jurisdiction because SCI and Fort Lincoln were their joint employers, pursuant to *Salinas v. Commercial Interiors, Inc.*, 848 F.3d 125 (4th Cir. 2017), in which the United States Court of Appeals for the Fourth Circuit adopted a six-factor test, separate and distinct from the requirements for personal jurisdiction, for assessing joint-employer status under the FLSA. *Id.* at 141-42. Although a company with joint-employer status could be deemed to be subject to personal jurisdiction in the state of employment if the factors supporting joint-employer status also constitute adequate contacts for specific jurisdiction, the evidence presently does not support a finding that SCI meets enough of the factors to so qualify, such as the factors relating to having the power to hire or fire a worker, having the power to supervise workers, and having ownership or control over the premises. *See id.* at 141. Notably, certain factors, such as whether the two entities jointly share employer functions such as

10

handling payroll, would apply to other subsidiaries of SCI, such as SCI Shared Resources, but not SCI itself. *See id.* Because SCI's own contacts with the forum state are minimal and its subsidiaries' contacts with Maryland cannot be imputed to it, these facts do not establish personal jurisdiction over SCI.

As for the issue of SCI's status as a party to the MRPA, although the MRPA was signed by Plaintiffs in Maryland, because the MRPA appears to be a form document that likely was drafted for general use across the United States, and SCI is brought into the agreement as a party only because Plaintiffs have taken the position that it is "another related entity" that "may be responsible for" their claims, J.R. 26, the present record does not definitively establish that SCI "purposely availed itself of the privilege of conducting activities" in Maryland through this agreement. *See Perdue Foods LLC*, 814 F.3d at 189. The Court need not seek additional facts about SCI's role in the adoption of the MRPA to further assess whether SCI's status as a party to the MRPA could confer personal jurisdiction in this Court because, as set forth below, based on that status, all claims against SCI must be dismissed and sent to arbitration. *See infra* Part II. Notably, SCI cannot evade Plaintiffs' claims entirely because during the hearing on the Motion, SCI committed that if this case is sent to arbitration pursuant to the MRPA, it will not challenge the jurisdiction of an arbitrator in Maryland to hear the claims against SCI. Because the present record does not support a finding of personal jurisdiction, the Court will grant the Motion as to the claims against SCI and dismiss those claims without prejudice.

## II.     Arbitration

Defendants seek dismissal of this case on the grounds that, based on the Plaintiffs'

execution of the MRPA, the parties are bound to resolve their dispute in arbitration.   Defendants

assert this argument under Federal Rule of Civil Procedure 12(b)(3) as a motion to dismiss for

improper venue.  *See Aggarao v. MOL Ship Management Co., Ltd.*, 675 F.3d 355, 365-66 n.9 (4th

Cir. 2012) (noting that an arbitration clause has been characterized as a forum selection clause,

and that "a motion to dismiss based on a forum-selection clause should be properly treated under

Rule 12(b)(3) as a motion to dismiss on the basis of improper venue" (citation omitted)).

### A.     Legal Standard

In seeking dismissal, Defendants argue that under the Federal Arbitration Act ("FAA"), 9

U.S.C. §§ 1-16 (2018), the parties' arbitration agreement must be enforced.   The FAA states that:

> A written provision in any maritime transaction or a contract evidencing a
> transaction involving commerce to settle by arbitration a controversy thereafter
> arising out of such contract or transaction, or the refusal to perform the whole or
> any part thereof, or an agreement in writing to submit to arbitration an existing
> controversy arising out of such a contract, transaction, or refusal, shall be valid,
> irrevocable, and enforceable, save upon such grounds as exist at law or in equity
> for the revocation of any contract.

*Id.* § 2.  Upon a finding that an issue is "referable to arbitration under such an agreement," a court

"shall on application of one of the parties stay the trial of the action until such arbitration has been

had in accordance with the terms of the agreement[.]"  *Id.* § 3.  Thus, a litigant in federal court

may compel arbitration under the FAA upon a demonstration of:  (1) the existence of a dispute

between the parties; (2) a written agreement that includes an arbitration provision that purports to

cover the dispute; (3) the relationship of the transaction, which is evidenced by the agreement, to

interstate or foreign commerce; and (4) the failure, neglect, or refusal of the other party to arbitrate

the dispute.  *Whiteside v. Teltech Corp.*, 940 F.2d 99, 102 (4th Cir. 1991).  Here, the Plaintiffs

dispute only the second of these elements, arguing that there is no valid agreement to arbitrate their

claims against Fort Lincoln and SCI. In deciding whether such a valid arbitration agreement exists between the parties, the Court applies ordinary state law principles governing the formation of contracts. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Because there is no dispute that the relevant arbitration agreements were entered into in Maryland, Maryland law applies to the evaluation of their formation and the interpretation of their terms. *See Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988) (stating that "the law of the jurisdiction where the contract was made controls its validity and construction").

### B.      Applicable Agreement

As a threshold issue, Plaintiffs argue that the PEAP, not the MRPA, applies to their claims based on alleged FLSA violations that occurred before they signed the MRPA. The distinction is of significance because the MRPA bars Plaintiffs from asserting a class or collective action, while the PEAP does not.

Under Maryland law, contract terms are interpreted by considering the "customary, ordinary, and accepted meaning of the language used." *Fister v. Allstate Life Ins. Co.*, 783 A.2d 194, 199 (Md. 2001). Section I.B of the MRPA states: "The PEAP will continue to cover all disputes commenced before the Effective Date, unless the parties agree to apply this Program." The MRPA defines "Effective Date" as the date of an employee's hiring and defines "Covered Disputes" to include "present or future claims" between the employer and the employee that "arise out of or relate in any way" to the employee's employment, including claims related to "wages and compensation" and specifically any claims under the FLSA. J.R. 26, 28-29. Each Plaintiff received and signed the MRPA in 2019.

Plaintiffs argue that the PEAP applies to a Plaintiff's claim that arose before that particular Plaintiff signed the MRPA, because the term "disputes" as used in MRPA Section I.B should be

13

interpreted to mean "both filed and potential causes of action." Opp'n at 9, ECF No. 24-1. This reading overlooks the critical phrase, "commenced before the Effective Date," which modifies "disputes." J.R. 26. Under Maryland law, a claim arises or accrues when its factual predicates occur and the plaintiff knows or should have known that they have occurred. *See Litz v. Maryland Dept. of Environment*, 76 A.3d 1076, 1092-93 (Md. 2013) (stating the accrual rule for inverse condemnation); *Vigilant Ins. Co. v. Luppino*, 723 A.2d 14, 17 (Md. 1999) (stating the accrual rule for breach of contract). An action does not "commence," however, until the plaintiff files suit. *See* Md. Code Ann. Cts. & Jud. Proc. § 5-101 (LexisNexis 2020) ("A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced."); *id.* § 5-119 (providing that if "a civil action or claim is commenced by a party within the applicable period of limitations and is dismissed without prejudice, the party may commence a new civil action or claim for the same cause against the same party" within certain deadlines); *cf.* Fed. R. Civ. P. 3 ("A civil action is commenced by filing a complaint with the court."). Based on this distinction, and the plain meaning of the term, to "commence" requires an affirmative step to initiate or file a formal dispute and does not refer merely to the existence or discovery of a potential dispute. Though the MRPA does not specifically define the term "commence," it recognizes this distinction when it states that a party "starts" the MRPA's dispute resolution process "by giving the other party notice in writing" that includes "the nature of all claims, the facts upon which such claims are based and the relief or remedy sought." J.R. 30. In light of these definitions, "disputes commenced before the Effective Date" refers to disputes that were formally initiated, such as by issuing the written notice contemplated by the MRPA or by filing an actual lawsuit, before the MRPA took effect in 2019. The PEAP thus applies only to disputes for which such action was taken before the parties entered

14

into the MRPA.  Because Plaintiffs do not argue that they actually initiated such proceedings before entering the MRPA, the MRPA controls, and the PEAP does not apply to, Plaintiffs' present claims.

### C.    Unconscionability

Plaintiffs further argue that the Motion should be denied because the MRPA is both substantively and procedurally unconscionable.  The FAA "permits agreements to arbitrate to be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *AT&T Mobility, LLC v. Concepcion*, 563 U.S. 333, 339 (2011). "An unconscionable bargain or contract has been defined as one characterized by extreme unfairness, which is made evident by (1) one party's lack of meaningful choice, and (2) contractual terms that unreasonably favor the other party." *Walther v. Sovereign Bank*, 872 A.2d 735, 743 (Md. 2005) (citations omitted).

Plaintiffs argue that the MRPA is substantively unconscionable because it unreasonably favors the employer in that it bars an employee from "compelling third-party document or deposition discovery" and also prevents an employee from compelling "the hearing testimony of employees and former employees of Fort Lincoln." Opp'n at 7-8.  As the MRPA provides that arbitrations will be governed by the JAMS Employment Arbitration Rules and Procedure, some discovery is authorized in an arbitration conducted pursuant to the MRPA. JAMS Rule 17(a) states in part that:

> The Parties shall cooperate in good faith in the voluntary and informal exchange of all non-privileged documents and other information (including electronically stored information ("ESI")) relevant to the dispute or claim immediately after commencement of the Arbitration. They shall complete an initial exchange of all relevant, nonprivileged documents, including, without limitation, copies of all documents in their possession or control on which they rely in support of their

positions, names of individuals whom they may call as witnesses at the Arbitration Hearing and names of all experts who may be called to testify at the Arbitration Hearing, together with each expert's report, which may be introduced at the Arbitration Hearing.

J.R. 362-63. In addition, Rule 17(b) allows each party to "take at least one deposition of an opposing Party or an individual under the control of the opposing Party" and grants the arbitrator discretion to permit additional depositions based on "the reasonable need for the requested information." J.R. 363. Notably, Rule 22(d) does not require "[s]trict conformity to the rules of evidence," and Rule 22(e) allows the arbitrator to "consider witness affidavits or other recorded testimony even if the other Parties have not had the opportunity to cross-examine." J.R. 365-66.

The MRPA, however, states that "[t]he Parties agree that Rules 6(e) and 21 of the current Employment Arbitration Rules and Procedure do not apply to any arbitration under" the MRPA. J.R. 31. Rule 21 provides that:

> At the written request of a Party, all other Parties shall produce for the Arbitration Hearing all specified witnesses in their employ or under their control without need of subpoena. The Arbitrator may issue subpoenas for the attendance of witnesses or the production of documents either prior to or at the Hearing pursuant to this Rule or Rule 19(c). The subpoena or subpoena duces tecum shall be issued in accordance with the applicable law. Pre-issued subpoenas may be used in jurisdictions that permit them. In the event a Party or a subpoenaed person objects to the production of a witness or other evidence, the Party or subpoenaed person may file an objection with the Arbitrator, who shall promptly rule on the objection, weighing both the burden on the producing Party and witness and the need of the proponent for the witness or other evidence.

J.R. 365. By eliminating Rule 21, the MRPA apparently precludes, absent voluntary cooperation, not only any discovery from third parties, whether of documents or deposition testimony, but also the ability of Plaintiffs to compel the testimony of company witnesses at the arbitration hearing.

Arbitration agreement terms that preclude parties from "effectively vindicating their statutory rights" can render the agreement substantively unconscionable. *In re Cotton Yarn Antitrust Litigation*, 505 F.3d 274, 286 (4th Cir. 2007). Courts have acknowledged that an

arbitration agreement's terms relating to discovery may unfairly advantage the employee when most of the evidence and witnesses are under the control of the employer. *See, e.g., Domingo v. Ameriquest Mortg. Co.*, 70 F. App'x 919, 920-21 (9th Cir. 2003).   Restrictions on discovery may provide a basis for concluding that an arbitration agreement is unenforceable if they prevent a party from having a "fair opportunity to present their claims." *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 31 (1991).   Courts have found arbitration agreements unenforceable based in part on unreasonable limitations on discovery. *See, e.g., Walker v. Ryan's Family Steak Houses, Inc.*, 400 F.3d 370, 387-88 (6th Cir. 2005); *Domingo*, 70 F. App'x at 921; *Geiger v. Ryan's Family Steak Houses, Inc.*, 134 F. Supp. 2d 985, 996 (S.D. Ind. 2001).   Generally, however, "[b]ecause limited discovery is a consequence of perhaps every agreement to arbitrate, it cannot, standing alone, be a reason to invalidate an arbitration agreement." *In re Cotton Yarn Antitrust Litigation*, 505 F.3d at 286.   Under Maryland law, a provision generally notifying the parties that arbitration "may result in limited discovery" is insufficient to render an arbitration agreement substantively unconscionable. *Freedman v. Comcast Corporation*, 988 A.2d 68, 87, 89 (Md. Ct. Spec. App. 2010) (noting that "[p]arties commonly agree to arbitrate under limited discovery").   Here, Plaintiffs' objections to the arbitration agreement focus almost entirely on limitations on discovery, specifically, the elimination of the ability to subpoena third parties for documents or deposition testimony.

Plaintiffs identify two objectionable provisions that arguably extend beyond discovery limitations.   By eliminating JAMS Rule 21, the MRPA also removed a requirement that, upon request of a party, other parties must produce "specified witnesses in their employ or under their control without need of subpoena" and a provision authorizing the arbitrator to issue subpoenas for third-party witnesses to testify at the arbitration hearing. J.R. 365.   Although a combination of

17

discovery limitations and other restrictions, such as limitations on the conduct of the arbitration hearing itself, potentially could render an arbitration agreement substantively unconscionable, Plaintiffs have the burden to establish that the specific terms at issue will actually prevent them from "vindicating their statutory rights." *In re Cotton Yarn Antitrust Litigation*, 505 F.3d at 286. "This burden is a substantial one and cannot be satisfied by a mere listing of ways that the arbitration proceeding will differ from a court proceeding, or by speculation about difficulties that *might* arise in arbitration." *Id.* at 286-87 (finding that the plaintiffs in an antitrust case failed to meet this burden even though they argued that an arbitration agreement's discovery limitations would have an adverse impact because "antitrust claims are uniquely dependent on the ability to engage in wide-ranging discovery").

Here, Plaintiffs have failed to meet this burden. Pursuant to JAMS Rule 17, Plaintiffs likely would be able to obtain relevant documents in the possession or control of Fort Lincoln. Under the plain language of the MRPA, SCI and SCI Shared Resources are parties to the MRPA, and at the hearing, SCI's counsel committed that SCI would not seek to argue that the arbitrator lacks jurisdiction over it, so SCI would be a party to the arbitration and would be required to produce relevant documents in its possession. Though SCI Shared Resources is not a named party in the present action, Defendants also conceded at the hearing that all relevant documents held by SCI, SCI Shared Resources, or any other subsidiaries of SCI are, as a legal and factual matter, in the possession and control of Defendants, as are any phone records relating to company phones used by Fort Lincoln personnel, and thus would be subject to discovery in the arbitration proceeding.

As for witnesses, Rule 17 provides that Plaintiffs could take at least one deposition of a company witness and could be granted leave to take other depositions based on "the reasonable

need for the requested information." J.R. 363. Though Plaintiffs have asserted that they may need testimony from current and former Fort Lincoln employees to establish the number of hours worked by Plaintiffs, they have not stated how many and which current Fort Lincoln employees they would seek to depose and have thus not shown how this provision, which permits multiple depositions if authorized by the arbitrator, would actually prevent them from securing the testimony of any relevant company witnesses. *See Geiger*, 134 F. Supp. 2d at 996 (stating that "discovery procedures," including "allowing just one deposition as of right," "alone do not necessarily make the forum unsuitable; rather, it is the limited discovery, controlled by a potentially biased arbitration panel, which creates the unfairness to claimants"). Though the removal of Rule 21 would also eliminate a requirement that company witnesses be produced at the arbitration hearing, because Rule 22(e) permits the arbitrator to receive and rely upon witness affidavits and deposition testimony, Plaintiffs' failure to demonstrate that necessary company witnesses cannot be deposed also precludes a finding that this rule change would preclude a fair opportunity to present evidence on their claims derived from such witnesses. Finally, Plaintiffs also have not specifically identified any former Fort Lincoln employees whose deposition or hearing testimony they would need in order to fairly present their claims but whose appearance could not be obtained without a subpoena. As a practical matter, Defendants' counsel committed at the hearing to agree to the issuance of subpoenas to third-party witnesses to appear at the arbitration hearing. Under these circumstances, the Court finds that Plaintiffs have not met their burden to establish that the arbitration agreement so "unreasonably favor[s] the other party" as to be substantively unconscionable. *Walther*, 872 A.2d at 743.

In so concluding, the Court does not find that an arbitration agreement that eliminates procedural safeguards such as Rule 21 could not be deemed substantively unconscionable,

particularly in combination with other restrictions. Indeed, when a company requires its employees to submit to an arbitration agreement that generally adopts standard arbitration rules such as the JAMS rules, the affirmative decision to modify such well-established rules by excising a significant rule such as Rule 21 and thereby to curtail employees' ability to secure information in support of their claims can only be interpreted as an unseemly effort to gain further advantage in the arbitration proceeding. Nevertheless, where Plaintiffs have done no more than describe "difficulties that *might* arise in arbitration" as a result of these terms, the Court does not find that, under the present circumstances, the MRPA is substantively unconscionable. *In re Cotton Yarn Antitrust Litigation*, 505 F.3d at 286-87.

Plaintiffs further argue that the MRPA was procedurally unconscionable under Maryland law because it is a contract of adhesion, presented with no opportunity for negotiation, and which they were required to sign in order to start employment with Fort Lincoln. Under Maryland law, however, a plaintiff must prove both forms of unconscionability to prevail, *Walther*, 872 A.2d at 746-47 (stating that, "even assuming *arguendo* that" an agreement is "a contract of adhesion, that is not the end of the inquiry—we must examine the *substance* of the particular provision at issue, the arbitration clause, to decide whether it is unconscionable"); *Freedman*, 988 A.2d at 85 ("[B]oth procedural and substantive unconscionability must be present in order for a court to invalidate a contractual term as unconscionable."). Because the Court has concluded that the MRPA is not substantively unconscionable under the present circumstances, it need not determine whether the MRPA is procedurally unconscionable.

Where the MRPA is not substantively unconscionable and is therefore enforceable, the Court will grant the Motion and dismiss all claims in favor of arbitration.

### III. Motion to Strike Collective Action Allegations

Section III of the MRPA prohibits collective or class actions, and the MRPA also prohibits arbitrators from consolidating actions pursuant to JAMS Employment Arbitration Rules and Procedure Rule 6(e). In response to Defendants' request that the collective action allegations be stricken pursuant to these provisions, Plaintiffs argue only that the PEAP applies to claims that predate the MRPA and therefore allows collective action allegations stemming from that time period. As discussed above, however, the MRPA applies to the claims in this case. *See supra* Part II.B. Because the MRPA prohibits collective actions and such a prohibition is lawful, *Walther*, 872 A.2d at 751, Defendants' Motion to Strike Collective Action Allegations will be granted.

### CONCLUSION

For the foregoing reasons, the Defendants' Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(3), Strike the Collective Action Allegations, and Dismiss the Complaint against SCI for Lack of Personal Jurisdiction will be GRANTED. A separate Order shall issue.

Date: March 23, 2021

THEODORE D. CHUANG
United States District Judge